UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) ) ) | |
| v. | ) ) | Criminal No. 11-10223-DJC |
| TERRANCE MOON, | ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                                   **January 10, 2013**

**I.   Introduction**

Defendant Terrance Moon ("Moon") has been charged in an indictment, filed on June 8, 2011, with possession with intent to distribute controlled substances, namely heroin and cocaine (Counts I and II), being a felon in possession of a firearm and ammunition (Count III) and possession of a firearm in furtherance of a drug trafficking crime (Count IV). D. 6.[1]  The Court has previously denied Moon's motion for a Franks hearing (and a related discovery motion) and rejected his argument that the search warrant executed on February 6, 2011 at 99 Ormond Street, Apartment #1 in Mattapan was not supported by probable cause. United States v. Moon, No. 11-10223-DJC, 2012 WL 2178923, at *1 (D. Mass. June 13, 2012) ("Moon I").  Moon has now moved to suppress his statement to law enforcement officers in the course of their execution of that search warrant and during his subsequent booking at the police station on the grounds that his waiver of Miranda rights was not knowingly, intelligently and voluntarily made and that the

---

[1] For reasons unrelated to the pending motion, the government has now dismissed Counts I, II and IV.  D. 78.

statements were not voluntary. D. 76 at 1. Upon consideration of the motion and after evidentiary hearing held on November 19, 2012, the Court DENIES this motion.

## II.     Standard of Review and Burden of Proof

The Fifth Amendment and well settled law require that prior to a custodial interrogation, police must inform a person accused of criminal conduct of his right to remain silent; that his statements may be used against him at trial; that he has a right to an attorney during questioning and that if he cannot afford an attorney, one will be appointed for him (i.e. "Miranda rights"). Miranda v. Arizona, 384 U.S. 436, 479 (1966); United States v. Guerrier, 669 F.3d 1, 5 (1st Cir. 2011); see United States v. Gonzalez, 719 F. Supp. 2d 167, 170-71 (D. Mass. 2010) (discussing Miranda). A defendant may knowingly, intelligently and voluntarily waive any of these rights, id. at 170, but the burden is on the government to prove that he did so. Berghius v. Thompkins, __ U.S. __, 130 S.Ct. 2250, 2262 (2010) (noting that "[w]here the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent"); United States v. Andrews, 847 F. Supp. 2d 236, 246 (D. Mass. 2012). Such waiver must involve "uncoerced choice" and "the requisite level of comprehension" by the individual for the Court to determine that there has been a knowing, intelligent and voluntary waiver of Miranda rights. Moran v. Burbine, 475 U.S. 412, 421 (1986).

To survive a motion to suppress on Fifth Amendment grounds, a defendant's incriminating statements to police must be voluntary. See Jackson v. Denno, 378 U.S. 368, 380 (1964); see 18 U.S.C. § 3501. The voluntariness of a defendant's admission "depends on whether the will of the defendant was overborne so that the statement was not a free and voluntary act." United States v. Massaro, 560 F. Supp. 2d 96, 106 (D. Mass. 2008) (citing

Procunier v. Atchley, 400 U.S. 446, 453 (1971)). The determination of same involves a consideration of the "totality of the surrounding circumstances…including the characteristics of the accused and the details of the interrogation." Id.; see United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999) (noting that such circumstances include "age, education, experience, intelligence, and knowledge of the right to withhold consent") (internal citation and quotation marks omitted).

### III. Factual Findings

The Court will not repeat the factual background relating to the investigation of Moon and the basis for the search warrant sought for the Ormond Street residence that it recited in Moon I, but makes factual findings relevant to the presently pending motion to suppress.

Officers of the Boston Police Department ("BPD") applied for and received search warrants for 99 Ormond Street, Apartment 1 in Boston ("the Ormond Street address") and for Moon's person. Tr. at 12.[2] On February 6, 2011, BPD Detective Michael Ross and BPD Sergeant Detective Paul Murphy, who both testified at the evidentiary hearing, along with other officers, executed a search warrant on the Ormond Street address where Moon was residing. Tr. at 12, 40. To do so, the Detectives set up surveillance outside of the Ormond Street address to observe Moon exit the apartment. Tr. at 12. The detectives observed Moon exit the apartment, meet up with an unidentified individual, walk down the street and have what appeared to be a drug transaction with this individual. Tr. at 13-14, 25, 41. The officers then observed Moon walk back toward the Ormond Street address. Tr. at 14, 41. The two detectives (in plainclothes, but with police badges around their necks, Tr. at 26, 47) got out of their unmarked vehicle and approached Moon on the sidewalk as he was walking back toward the apartment. Tr. at 14-15, 26-27, 42. When they stopped Moon, he was a few houses away from the Ormond Street

---

[2] Transcript references are to the transcript of the evidentiary hearing held on November 19, 2012. D. 102.

address. Tr. at 15, 44. Sergeant Detective Murphy addressed him by name since he knew him,[3] but Detective Ross, who was the lead detective, did most of the talking. Tr. at 42. During this interaction, Sergeant Murphy may have asked Moon to open his mouth to see if he was hiding any drugs in it. Tr. at 47, 51. Detective Ross explained to Moon why they were stopping him, showed him a copy of the search warrant for his person and read him his Miranda rights from a card that the detective carries. Tr. at 15-16, 28-29, 42-43, 49; Exh. 1. After Detective Ross had read him all of the Miranda rights, Moon indicated that he understood these rights. Tr. at 19, 30-31, 43, 50. When Detective Ross mentioned that he had a second search warrant for the Ormond Street address, Moon initially said that he did not live there. Tr. at 20, 29, 43.[4] Detective Ross searched Moon (who was now handcuffed), pursuant to the search warrant for same, finding a cell phone, wallet and keys. Tr. at 20, 22, 44. When asked by the detective if the keys from his person would open the Ormond Street address, he said that they would not. Tr. at 20. However, when asked about whether anyone was at home at the Ormond Street address, Moon conceded that he did live there. Tr. at 20, 43-44.

Detective Ross, Sergeant Detective Murphy and other BPD officers then proceeded to the Ormond Street address to execute the search warrant there, while Moon was placed in the marked police cruiser of another officer, Officer Steven Smigliani, who also testified at the hearing. Tr. at 21, 31, 52, 58. At the apartment, Detective Ross knocked and announced their presence as BPD officers with a warrant. Tr. at 21, 32. Receiving no answer, the detective used the keys from Moon to open the door. Tr. at 21-22, 44. The officers found no one in the

---

[3] Sergeant Detective Murphy testified that he had arrested Moon on three prior occasions and that he had testified against him in another case in state court. Tr. at 50. During the course of this interaction, the officer indicated that he and Moon had some discussion about what Moon had previously alleged the officer had said in that matter. Tr. at 50-51.

[4] In addition to their surveillance of Moon that day, the officers had previously observed Moon leave the Ormond Street address on other occasions. Tr. at 21. The police investigation had also revealed that Moon's vehicle and the apartment were in the name of Sherrica Hendricks. Tr. at 21, 36, 53.

apartment and secured it. Tr. at 22, 45. After doing so, Moon, who remained handcuffed, was brought into the apartment by Officer Smigliani. Tr. at 22, 58. Detective Ross, with Sergeant Detective Murphy present, then told Moon that the officers had a search warrant for the Ormond Street address and were going to search the apartment thoroughly so if there were "any drugs or anything" there, he should cooperate and let them know where they were located. Tr. at 23, 32-33, 45. Moon responded by explaining that he had some drugs in a red box by the nightstand in his bedroom. Tr. at 23, 32, 45. Moon disclaimed the presence of any other drugs in the apartment. Tr. at 23, 32-33. The detectives denied making any threats against Moon, his girlfriend, Sherrica Hendricks, or his son, who also resided in the apartment. Tr. at 23-24, 45-46, 53-54.

When the officers then proceeded to execute the search warrant, they found drugs on the nightstand where Moon had indicated they would be. Tr. at 24. Officer Smigliani then escorted Moon to the police station to be booked on drug charges. Tr. at 24, 59. While Moon was being transported to the police station, the officers still at the Ormond Street address discovered a .357 magnum under the mattress of his bed in Moon's bedroom where the drugs had been found. Tr. at 24, 35.

While officers still remained on the scene at the Ormond Street address, Officer Smigliani had taken Moon back to the station. Tr. at 35-36, 59. There, the officer brought Moon into the booking area and started the process of having him booked on criminal charges. Tr. at 59. Officer Smigliani gave the booking officer there the relevant information about the drug charges and the booking officer proceeded to ask Moon for relevant information to complete the booking process. Tr. at 60-61. The officers on the scene called Officer Smigliani to amend the charges against Moon to add unlawful firearm and ammunition possession charges. Tr. at 24,

35, 60. After this call, Officer Smigliani told the booking officer to add these charges against Moon. Tr. at 61. Officer Smigliani was speaking to the booking officer to convey this new information, and not to Moon. Tr. at 61. However, after Officer Smigliani made this statement, Moon, who remained present, said "I forgot about that." Tr. at 61, 62-63.

## IV. Discussion

### A. Moon Knowingly, Intelligently and Voluntarily Waived His Miranda Rights and Made A Voluntary Statement to the Detectives While at the Ormond Street Address

Moon answered Detective Ross's question about the location of any drugs at the Ormond Street address after he had been advised of his Miranda rights and indicated that he understood them.[5] I credit the testimony of the two detectives that Detective Ross read Moon his Miranda rights on the sidewalk when they approached and spoke to Moon as he was walking back to his apartment. The Court also finds and credits the testimony that Moon told the officers that he understood these rights after Detective Ross recited them to him. There is no credible suggestion in the record before the Court that Moon, who is not new to the criminal justice system, did not have "the requisite level of comprehension" of these rights and there is nothing about the circumstances in which they were recited to him that suggests otherwise.

Moreover, the Court rejects Moon's argument that there were coercive atmosphere to suggest that his waiver of Miranda rights or his statement was not voluntary. Both detectives denied making any threats against Moon or making threats to him about Sherrica Hendricks or

---

[5] The government had initially argued that Miranda rights were not required since Moon was not in custody at the time he made this statement. However, at the close of the evidentiary hearing where the officers had testified that Moon was placed in handcuffs, in the custody of Officer Smigliani before he was escorted into the Ormond Street address and remained in handcuffed during the questioning, the government has not vigorously pressed this issue. See Guerrier, 669 F.3d at 6 ("[a] person need not be under arrest for Miranda rights to arise. . . . "[b]ut he must be in 'custody'") (internal citation omitted). Based upon the officers' testimony, Moon was in custody at the time of Detective Ross's question to him. However, whether Moon was in custody at the time is not dispositive since the Court finds that, either way, he was given and understood his Miranda rights before any interrogation began.

Moon's son and the Court credits this testimony.[6] Although Sergeant Detective Murphy acknowledged having encountered Moon on several prior occasions and having inquired about Moon's prior representations about him to another court, he also described the officers' interaction with him on this occasion as "calm", Tr. at 46, and described Moon as a "just a gentlemen" throughout their encounter. Tr. at 47. There is no credible evidence before this Court[7] that any of circumstances of February 6, 2011 overborne Moon's will such that his statement identifying the location of his drugs, after the officers indicated that they had a search warrant for the premises and after they had entered those premises using a key found on his person, was anything but knowingly, intelligently and voluntarily made.

### B. Moon's Statement During Booking Was Not in Response to Any Police Interrogation and was Also Voluntarily Made

Moon made his statement about having "forgot about that [loaded firearm]" spontaneously and not in response to any questions by Officer Smigliani or the booking officer. The Court finds that it came on the heels of Moon hearing Officer Smigliani instruct the booking officer to amend the charges to include unlawful firearm and ammunition possession charges. This spontaneous statement was "not in response to any questions, words or acts on the part of the [o]fficers that were reasonably likely to elicit an incriminating response." United States v. Thurston, 774 F. Supp. 666, 669 (D. Me. 1991) (citing Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). Accordingly, the statement "[was] not the product of a custodial interrogation or its

---

[6] Moreover, even as Moon claims in his affidavit that one of the officers threatened to charge his girlfriend, Sherrica Hendricks, with any drugs that they found in the apartment, D. 76-1, such threat would not necessarily be an illegitimate one (given that the two lived together in the apartment) and "[w]hat renders a confession involuntary is not *any* threat or promise, but rather a threat or promise of illegitimate action." United States v. Contreras-Del Toro, 892 F. Supp. 159, 160 (S.D. Texas 1995); see United States v. Yonuss, 2006 WL 2056633, at *7 n. 11 (D. Me. 2006).

[7] To extend that Moon's affidavit, D. 76-1, suggests otherwise, the Court does not credit it.

functional equivalent" and were entirely voluntary and will not be suppressed. United States v. Lynch, 813 F. Supp. 911, 915 (D. N.H. 1993). However, even if the circumstances could be deemed to be a custodial interrogation, Moon had previously been advised on the scene of the Ormond Street address of his Miranda rights, indicated that he understood these rights, and there is nothing about the description of the booking procedure to suggest that Moon's utterance was not otherwise voluntary. See United States v. Massaro, 560 F. Supp. 2d 96, 106 (D. Mass. 2008) (denying motion to suppress spontaneous statement during booking after defendant had been advised of Miranda rights).

V.     **Conclusion**

For the foregoing reasons, Moon's motion to suppress his statements on February 6, 2011 at the Ormond Street address regarding the location of the drugs there or his statement during booking regarding the discovery of the loaded firearm is DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge